UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEAN SIMPSON, INDIVIDUALLY & AS EXECUTRIX OF THE ESTATE OF WILLIAM SIMPSON<br>Plaintiffs, | : : : : : | CASE NO. 3:15-cv-1859 (VLB) |
| v. | : : | |
| THE UNITED STATES OF AMERICA,<br>Defendant. | : : | February 15, 2018 |

**MEMORANDUM OF DECISION REGARDING DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT**

I.  Introduction

Before the Court are Defendant United States of America's Motions to Exclude Expert and for Summary Judgment. [Dkts. 57, 59.] Plaintiff Jean Simpson, individually and as executrix of the estate of William Simpson, opposes the motions. [Dkts. 66, 74.] For the reasons discussed below, Defendant's Motion for Summary Judgment is GRANTED and the Motion to Exclude Expert is found as moot.

II.  Factual Background

The United States Department of Veterans Affairs operates a hospital in West Haven, Connecticut (the "VA Hospital"). [Dkt. 61-1 at Ex. B (Daily Dispensing Log), Dkt. 61-2 at Ex. F (Deposition of George Whetstine, R.N.).] The VA Hospital operates an opiate treatment program which provides Methadone, weekly group meetings, and relapse prevention. Whetstine Dep. at 8-9. Prior to administering Methadone, a VA Hospital staff member determines whether the patient is registered as one who requires a urinalysis and if so, collects a sample

1

for testing.  [*Id*. at 11; Dkt. 74-5 (Deposition of Dr. Kishorchandra Gonsai) at 14.] The sample is sent to a urinalysis lab for testing later that day.  The VA Hospital does not immediately receive urinalysis results and does not rely on that day's urinalysis results to determine whether to dispense Methadone, but rather uses the results to develop a future treatment plan.  *Id*.

After collecting a urine sample, a nurse then speaks with the patient to determine whether the patient is unstable.  Whetstine Dep. at 11.  Indications of instability may include if the patient is "heavy lidded," unable "to have a conversation," or if the patient's behavior otherwise leads the nurse to believe the patient is "under some drug use." *Id*.  Other indications of instability might include "slurring his words, . . . wearing shoes on different feet, . . . [being] slumped over and looking . . . like he had either [consumed] alcohol or was in some way intoxicated." *Id*. at 39.  If the patient is stable, the nurse then administers Methadone and speaks with the patient again to confirm that he or she swallowed the dose.  *Id*. at 12.  If a patient's behavior "in any way seems inappropriate," the administrating nurse does not administer Methadone, but instead escorts the patient to the psychiatric emergency room and arranges for the patient to be seen by a doctor.  *Id*. at 16.

Frank Defurio was a patient at the VA Hospital's opiate treatment program who received daily doses of Methadone.  *Id*. at 16; [Dkt. 61-1 at Ex. E (Report of Dr. Mark Kraus) at 1; Dr. Gonsai Dep. at 13.]  He was a patient in good standing in the program and on the date of the events at issue had been receiving Methadone for approximately five years.  Dr. Kraus Report at 2; Dr. Gonsai Dep. at 12.  Mr.

Defurio had a history of post-traumatic stress disorder (PTSD), depression, opiate dependency, and substance abuse. Whetstine Dep. at 16; Dr. Kraus Report at 1-2.

At 8:00 a.m. on September 9, 2013 3George Whetstine, R. N., met with Mr. Defurio. [Dkt. 61-1 at Ex. A (Progress Note).] George Whetstine was Mr. Defurio's clinician, is familiar with Mr. Defurio's medical history, and has been a nurse with the VA Hospital for approximately 24 years. Whetstine Dep. at 37; [Dkt. 81 (Affidavit of Dr. Gonsai) at 2.]. Mr. Whetstine recorded a progress note memorializing the 8:00 a.m. meeting, stating Mr. Defurio "presented for [a] scheduled [appointment]" and "expressed desire to restart [the] VA wellness program." *Id*. His treatment notes indicate Mr. Defurio requested a "10 mg increase in Methadone 'back to 110 mg,'" which was his dose prior to a recent hospitalization. *Id*. Mr. Defurio denied experiencing opiate withdrawal symptoms, cravings, or relapse, but requested the return to his prior, higher dosage because "I know my body, I want to get back on my dose." *Id*. The progress note indicates a plan to increase Mr. Defurio's Methadone dose "as per MD and OTP team review." *Id*.

At or around the time of his 8:00 a.m. meeting with Mr. Whetstine, Mr. Defurio provided a urine sample, which was sent for lab testing that afternoon. Dr. Gonsai Dep. at 25-27. At 8:44 a.m., Marie Souza, R.N., dispensed 100 mg of Methadone to Mr. Defurio. Daily Dispensing Log at 2. When the laboratory tested Mr. Defurio's urine sample, it revealed a negative result for Methadone. Dr. Gonsai Dep. at 25-26. Since Mr. Defurio received daily doses of Methadone, and since a urine sample would test positive for Methadone if it had been ingested

within the last five days, Dr. Gonsai opined that the negative urinalysis may have been caused by a laboratory or sampling error, or if Mr. Defurio provided a false urine sample. *Id.* at 23, 26-27. There is no evidence in the record establishing the actual cause of Mr. Defurio's negative test result. As discussed *infra*, Mr. Defurio submitted to additional urinalysis later that day which was positive for Methadone.

At approximately 12:07 p.m., 68 year-old William Simpson began walking in a diagonal crosswalk from the southwest corner toward the northeast corner of a four-way intersection on the VA Hospital's property. Police Report at SIMP00035-36. Mr. Defurio drove a pickup truck along the southbound roadway on the VA Hospital's property, approached the stop sign at the crosswalk, and may have made a complete stop. *Id.* (explaining that video footage is unclear as to whether Mr. Defurio made a complete stop). Mr. Defurio then turned left and struck Mr. Simpson, who was over halfway across the crosswalk. *Id.* Mr. Simpson suffered injuries including death as a result of the collision. *Id.*

After the collision, Mr. Defurio pulled over and he and his passenger, William Slater, exited the vehicle. *Id.* at SIMP00054. At the scene, Mr. Defurio reported to police that he had been "heading east . . . as he approached the . . . intersection, . . . stopped at the stop sign and continued east bound 'straight on through.'" *Id.* Mr. Defurio asserted Mr. Simpson "jumped in front of my car" and denied fault for the collision. *Id.* Mr. Defurio stated he "never made contact with the pedestrian (Simpson) and further stated even if he did, he was going very slow[ly], so he could not have hurt him." *Id.* Mr. Defurio elaborated that the prior

4

day someone "had tied a rope to his pickup . . . and was 'surfing' in the roadway behind his truck as he exited the parking lot." *Id*. He asserted Mr. Simpson was the same person, and stated immediately following the September 9, 2013 incident he found rope tangled in and attached to his vehicle. *Id*. Mr. Defurio later changed his account, stating Mr. Simpson "slip[ped] on something in the road." *Id*. Throughout the interview with police, Mr. Defurio's pupils were dilated, and he appeared "very anxious and was agitated one moment, then apologetic the next." *Id*. at SIMP00054. Police reported that Mr. Defurio's account of the collision was inconsistent with the video footage captured on the VA Hospital's surveillance camera, and that he seemed "confused" and "delusional." *Id*. at SIMP00033. Police found no rope or string at the scene. *Id*. at SIMP00054.

At the police station, Mr. Defurio voluntarily submitted to a breath test which indicated he had consumed no alcohol. *Id*. at SIMP00055. He also submitted to two additional urinalyses, which both indicated Mr. Defurio had consumed Methadone and Lamotrigine, a seizure medication. *Id*. at SIMP00058. Mr. Defurio's medical records reflect that he is prescribed Lamotrigine. *Id*. at SIMP00057.

Police also interviewed William Slater, Jr., who was in the passenger seat of the pickup truck at the time of the collision. *Id*. at SIMP00056. Mr. Slater, who also receives daily doses of Methadone from the VA Hospital, stated he saw Mr. Simpson in the crosswalk prior to the collision and warned Mr. Defurio to "slow down" because "this guy's to[o] close to the truck." *Id*. at SIMP00055-56. Mr. Defurio then collided with Mr. Simpson, and Mr. Slater "watched as Simpson

5

disappeared from his view, then he felt a 'hump.'" *Id.* Mr. Slater then told Mr. Defurio to "pull over" and found that "sure enough we hit him." *Id.*

Dr. Kraus authored an expert report for the Government in this case and testified at a deposition. [Dkt. 74-3 (Dr. Kraus Dep.) at 121.] Dr. Kraus is an internist and addiction specialist, and Plaintiff has not moved to exclude Dr. Kraus's expert report or testimony. [Dr. Kraus Report at 5; Dkt. 65 at 9.] Dr. Kraus reviewed Mr. Whetstine's September 9, 2013 medical notes and found no indication that the VA Hospital should have involuntarily admitted Mr. Defurio. Dr. Kraus Dep. at 121. Dr. Kraus also testified that he reviewed police records, medical records from the VA Hospital, the Complaint, and the Plaintiff's expert's report, and found no evidence that the VA Hospital violated any standard of care in dispensing methadone to Mr. Defurio and allowing him to leave the clinic. *Id.* at 124; Dr. Kraus Report at 1-2.

Plaintiff brought this action sounding in premises liability on December 23, 2015. [Dkt. 1 (Complaint); Dkt. 33 (Order Denying Motion to Dismiss, finding that the Complaint sounds in premises liability rather than medical malpractice).]

On January 10, 2017, Plaintiff disclosed expert Dr. Mark Levin, M.D. [Dkt. 38.] Plaintiff agrees with Defendant's characterization that "Dr. Levin is an oncologist with a lapsed certification in hematology" who has not re-certified in the field of hematology in "[m]ore than 25 years." [Dkt. 65 (Opposition to Motion for Summary Judgment) at 7; Dkt. 38-2 (Levin CV).] Plaintiff agrees that Dr. Levin is not an expert in psychiatry, substance abuse treatment, or addiction medicine. [Dkt. 65 at 7-8.] Dr. Levin has never worked at a methadone treatment center and

has never been involved in "premises safety for a methadone treatment center." [Dkt. 58-2 (First Deposition of Dr. Levin) at 105-06.] Rather than relying on expertise in psychology, substance abuse treatment, or addiction medicine, Dr. Levin seeks to opine as to the "the standard of care that's common to all specialties that take care of patients like Mr. Defurio. . . . The issue here is the responsibility of physicians and systems for releasing a patient that is dangerous to himself and others. That is something that goes across all specialties." Dr. Levin Dep. at 60.

Dr. Levin did not review Mr. Defurio's medical records from September 9, 2013 in rendering his opinion, but rather based his decision on a "description of . . . his behavior by the police officers at the site" as well as medical "notes from the subsequent day and subsequent days." *Id.* at 68. Dr. Levin confirmed that he reviewed no "information that indicates that the patient was showing the signs [described in the police report] at 8:44 in the morning on the day of September 9, 2013." [Dkt. 58-3 (Second Deposition of Dr. Levin) at 15.] Dr. Levin conducted no independent analysis in authoring his expert report.

Based on his review of those records, Dr. Levin opined that "at least some or many of the findings that were reported by the police a few hours later" must have been "evidenced" at 8:44 a.m. when he was administered Methadone. *Id.* at 5. Dr. Levin asserted the VA Hospital should not have administered Mr. Defurio methadone, "should have initiated an admission" of Mr. Defurio, and "should have . . . detoxed [Mr. Defurio]." *Id.* at 5-6. Dr. Levin also opined that, based on Mr. Defurio's "cumulative weight of medical, psychiatric, and social history," the

7

VA hospital "should have . . . issu[ed] a complaint that would result in the withdrawal of Mr. Defurio's driver's license and prevented Mr. Simpson's death." *Id.* at 4. Beyond opining about the VA Hospital's actions, Dr. Levin also opined that the supervisor of the group home where Mr. Defurio resides "could have . . . brought Mr. Defurio to the Methadone clinic" as he did after the accident. *Id.* at 5.

### III. Standard of Review: Motion for Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). In order to prevail, the moving party must sustain the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for

8

summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable

rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251 (citing *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 343 (1933); *Coughran v. Bigelow,* 164 U.S. 301, 307 (1896)). Indeed, summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4).

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record. Fed. R. Civ. P. 56(c)(3). If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary judgment on the basis of the undisputed facts. D. Conn. L. Rule 56(a)(3) (stating

that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)(1) or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").

IV. Discussion

Defendant asserts there is no genuine issue of material fact supporting Plaintiff's premises liability claim, and accordingly moves for summary judgment. [Dkt. 67 (Motion for Summary Judgment) at 3.]

"A business owner owes its invitees a duty to keep its premises in a reasonably safe condition" and to "warn an invitee of dangers that the invitee could not reasonably be expected to discover." *DiPietro v. Farmington Sports Arena, LLC*, 306 Conn. 107, 116 (Conn. 2012). To hold a defendant liable for breach of that duty, the plaintiff must establish: "(1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect, and (3) that such defect had existed for a sufficient length of time that the [defendant] should, in the exercise of reasonable care, have discovered it in time to remedy it." *Crocker*, 3:08-cv-1570, 2010 WL 326334, at *2 (D. Conn. Jan. 21, 2010) (quoting *Martin v. Stop & Shop Supermarket Co.*, 70 Conn. App. 250, 251 (Conn. App. Ct. June 4, 2002)); *Dimmock v. Lawrence & Mem. Hosp.*, 286 Conn. 789, 812 (2008) (same). The defendant's actual or constructive knowledge must be "of the very defect which occasioned the injury and not

merely of conditions naturally productive of that defect even though subsequently in fact producing it." *DiPietro*, 306 Conn. at 117.

In addition, as with all negligence claims, Plaintiff must establish that the defendant's breach of its "duty to maintain their premises in a reasonably safe condition" was both the actual and proximate cause of the plaintiff's injury. *Crocker*, 2010 WL 32633 at *2; *Weigold*, 81 Conn. App. at 354. "The test for [actual] cause in fact is, simply, would the injury have occurred were it not for the actor's conduct." *Paige v. St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 25 (1999). The test for proximate cause is "whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." *Id*. at 25. For proximate cause to exist, the causal connection "must be based upon more than conjecture and surmise." *Id*. at 26.

Expert testimony is not required to establish the standard of care in premises liability cases, as the standard of care "is defined generally by law as the duty 'to keep the premises in a reasonably safe condition." *DiPietro*, 306 Conn. at 115 n.3. However, notice of a defect on the premises "can be proven in a number of ways, including by expert testimony as to what the defendant ought to have known." *Id*. (affirming granting summary judgment where the plaintiff "did not produce *any* evidence on the essential element of notice, expert testimony or otherwise"); *Garrison v. Kohl's Dept. Stores*, 3:14–CV–00052, 2015 WL 4886496, at *4 n.2 (D. Conn. 2015) (finding no expert testimony necessary to establish that a half-hour inspection schedule for a premises was insufficient). "Expert testimony is unnecessary in cases where jurors are as capable of comprehending the

primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Garrison*, 2015 WL 4886496, at n.2; *see also Jackson v. Domtar Indus., Inc.*, 35 F.3d 89, 93 (2d Cir. 1994) (finding expert testimony unnecessary in a premises liability case in which a truck driver fell from atop his flatbed trailer, "given that conditions present before and at the time of the mishap and the danger associated with them were perfectly apparent and capable of analysis by any person of ordinary understanding").

Here, Plaintiff asserts the VA Hospital knew or should have known that Mr. Defurio was a "defect" posing a danger on VA Hospital property for two reasons. First, Plaintiff asserts Mr. Defurio must have exhibited the same symptoms at 8:44 a.m., when he was administered Methadone, as he exhibited when interacting with the police after the accident that afternoon. Second, in the alternative, Plaintiff asserts Mr. Whetstine saw Mr. Defurio "just" before the accident, and must have exhibited the same symptoms at *that* time as he exhibited after the accident. Plaintiff has failed to offer evidence creating a question of fact in support of either argument.

First, Plaintiff offers no evidence calling into question Mr. Defurio's condition at 8:00 a.m. when he interacted with Mr. Whetstine or at 8:44 a.m. when he was administered Methadone. The only record evidence regarding Mr. Defurio on the morning of September 9, 2013 indicates that (i) he had a coherent conversation with Mr. Whetstine about increasing his Methadone dosage, (ii) the VA Hospital nurses look for signs of instability before administering Methadone,

(iii) no Methadone would be administered if Mr. Defurio exhibited signs of instability, and (iv) that Mr. Defurio was in fact administered Methadone.

Dr. Levin's opinion that Mr. Defurio "must have" been in the same condition at 8:44 a.m. as he was in four hours later when he spoke with the police is unsubstantiated by record evidence. Even assuming, *arguendo,* that Mr. Levin is qualified to render an opinion as to the general duty of a doctor to admit a patient who poses a danger to himself or others, Mr. Levin's opinion is devoid of any evidentiary support, methodology, or analysis supporting his conclusion about Mr. Defurio's condition at 8:44 a.m. Rather, Dr. Levin's report merely summarizes record evidence, such as the West Haven Police Report describing Mr. Defurio's condition after the accident, and fails to explain any connection between that evidence and Mr. Defurio's condition three and a half hours prior beyond an assertion that it "must have" been similar. Dr. Levin's report is no more helpful to the Plaintiff than the evidence it summarizes. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (explaining that an expert opinion not based in generally accepted methodology is not helpful to the trier of fact). Plaintiff offers no *evidence* of Mr. Defurio's condition at 8:44 a.m. which would elevate Plaintiff's claim beyond mere speculation and conjecture. *See* Fed. R. Civ. P. 56(c)(1); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (mere speculation and conjecture are insufficient to defeat summary judgment).

Plaintiff's second argument fares no better. Plaintiff asserts Mr. Whetstine saw Mr. Defurio "just" before the accident, and argues surely Mr. Defurio was in the same condition at that time as after the accident when he spoke with the

14

police. [Dkt. 74 (Opposition to Summary Judgment Motion) at 3.] As with Plaintiff's prior argument, Plaintiff offers no evidence of Mr. Defurio's condition "just" before the accident, but instead relies on speculation based on Mr. Defurio's later condition. In addition, Plaintiff bases her argument that Mr. Whetstine saw Mr. Defurio "just" before the accident on two pieces of evidence which are belied by the rest of the record. First, Plaintiff points to the fact that Mr. Whetstine's progress note memorializing his conversation with Mr. Defurio is time-stamped 2:29 p.m. *Id*. at 3. Second, Plaintiff offers Mr. Defurio's statement to the police that he "had just left the area of building 36,35 and was driving east on Lamson Hill" before the accident. Police Report at SIMP00056.

Plaintiff's assertion that Mr. Whetstine saw Mr. Defurio between 8:44 a.m. and 12:07 p.m. is contradicted by Mr. Whetstine's explanation of the progress note's timestamp. Mr. Whetstine explained that the progress note indicates a "visit" time of "09/09/2013 8:00," which "means that I had an 8:00 a.m. meeting with Mr. Defurio on September 9, 2013." [Dkt. 80-1 (Whetstine Aff.) at 2.] The progress note indicates it was written at 2:29 p.m. because Mr. Whetstine wrote his "notes at the end of the day when I had time. You know, with other responsibilities, I might not get to it directly." Whetstine Dep. at 19. Plaintiff offers no evidence supporting its conjecture that Mr. Whetstine's sworn statements may be untrue.

In addition, Plaintiff's reliance on Mr. Defurio's statement that he "had just left the area of building 36,35" prior to the accident is insufficient to create a question of fact. Mr. Defurio's statement is directly preceded in the police report

15

by a description of Mr. Defurio's comments as "bizarre" and "delusional." *Id.* at SIMP00055. However, seemingly in an effort to avoid that context, Plaintiff does not cite to Mr. Defurio's statements within the police report. [Dkt. 74 at 4.] Rather, Plaintiff cites to the portion of Dr. Gonsai's deposition transcript where those statements were recounted to her. *Id.* Plaintiff attempts to mischaracterize that portion of the transcript as confirming that Dr. Gonsai believed Mr. Defurio was at the VA Hospital just before the accident. *Id.* On the contrary, Dr. Gonsai explicitly disavows any knowledge of Mr. Defurio's whereabouts before the accident. [Dkt. 81 (Dr. Gonsai Affidavit) at 3-4.]

Mr. Defurio's "delusional" account of the events surrounding the accident, which Plaintiff attempts to bolster by falsely linking it to Dr. Gonsai, does not create a question of fact as to when Mr. Defurio interacted with Mr. Whetstine. The record evidence is clear that Mr. Whetstine interacted with Mr. Defurio at 8:00 a.m. and VA Hospital staff administered him Methadone at 8:44 a.m. Plaintiff's reliance on conjecture to assert Mr. Defurio suffered a "mental episode in the direct presence of Mr. Whetstine moments before the collision" is insufficient to defeat summary judgment. Fed. R. Civ. P. 56(c)(1); *Hicks*, 593 F.3d at 166.

In addition, as previously stated, even if the Court were to accept Plaintiff's argument that Mr. Defurio saw Mr. Whetstine shortly before the accident, Plaintiff has offered no evidence that he was in a condition at that time which alerted, or should have alerted, Mr. Whetstine of his condition. Plaintiff has raised no question of fact as to whether (i) Mr. Defurio was in a condition such that he posed a danger on VA Hospital property prior to the accident, or (ii) whether VA

16

**Hospital staff knew or should have known of that dangerous condition for a sufficient period of time to have been able to remedy it.** *Id.* at 7.[1]

In addition, Plaintiff has not raised a question of fact as to whether the VA Hospital's treatment of Mr. Defurio actually or proximately caused the accident. Plaintiff has not attempted to address causation in her opposition to the motion for summary judgment, and the Court's own review of the record has unearthed no evidence in Plaintiff's favor. Rather, Plaintiff's proffered expert Dr. Levin himself testified at his deposition that Methadone "cannot explain everything," and "most likely than not there were other contributing causes" to Mr. Defurio's condition at the time of the accident. *Id.* at 94. Dr. Levin also opined that the accident might have been avoided if the supervisor of the group home where Mr. Defurio resides "brought Mr. Defurio to the Methadone clinic." Dr. Levin Report at 5. Plaintiff has not offered evidence that the VA Hospital's treatment of Mr. Defurio was a "substantial factor in bringing about the plaintiff's injuries," or that the injury would not have occurred but for the VA Hospital's conduct. *Paige,* 250

---

[1] Plaintiff also asserts the Court should reopen discovery to allow the Plaintiff to depose Mr. Slater, Mr. Defurio's passenger at the time of the collision, because Mr. Slater may be able to speak to Mr. Defurio's "specific mental condition . . . immediately following the collision" and may also be able to state when Mr. Defurio spoke with VA Hospital staff. [Dkt. 64.] By order dated May 15, 2017 the Court granted Plaintiff's motion to extend the discovery deadline to depose this witness. [Dkt. 48-49] Moreover, as explained herein, Plaintiff has not offered any evidence that Mr. Defurio's condition at the time of the collision was the same as his condition hours earlier, at 8:44 a.m., when he received Methadone. Additional descriptions or characterizations of Mr. Defurio's condition at the time of the accident would not create a genuine question of fact as to his condition at the time he was seen by Defendant, and therefore cannot preclude summary judgment. In addition, the West Haven Police Report indicates that Mr. Slater could not remember when he and Mr. Defurio received their daily dosage of Methadone when he was asked on the scene of the collision shortly after it occurred. Police Report at SIMP00055. Plaintiff has asserted no basis upon which the court could conclude that Mr. Slater's memory would be better now, five years after the collision, than it was at the scene of the accident moments after it occurred. Plaintiff's request is denied. Finally, Mr. Slater's persistent evasion of Plaintiff's efforts to depose him suggests he does not have information helpful to Plaintiff's case. [Dkt. 47, 64.]

17

Conn. at 25. Again, Plaintiff's argument fails to rise above the level of conjecture and surmise. *Id*. Defendant's Motion for Summary Judgment is GRANTED.

## V. Conclusion

Plaintiff has failed to present facts from which a reasonable jury could conclude that Defendant knew, or in the exercise of reasonable care should have known, that Mr. Defurio was impaired, or that his impaired condition was the proximate cause of her decedent's death. For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and this case is DISMISSED. Defendant's Motion to Exclude Dr. Levin is found as moot in light of this ruling. The Clerk is directed to close this file.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 15, 2018